AMBORT MED. PRODUCTS *v.* INTRA PRODUCTS

5-4126                                    411 S. W. 2d 662

Opinion delivered February 20, 1967

*Robert C. Downie* for appellant;

*W. J. Walker* for appellee.

J. FRED JONES, Justice. The appellee, Intra Products, Inc., hereinafter referred to as "Intra," is a manufacturer of drugs and pharmaceutical products, and the appellant, Ambort Medical Products, Inc., hereinafter referred to as "Ambort," is a distributor of such drugs and products in Arkansas and surrounding areas. This case involves a suit by Intra against Ambort for the sum of $1,376.02 allegedly past due on open account. Ambort filed answer and counterclaim for $2,178.53.

The case was tried to the trial court sitting as a jury and the "substantial evidence rule" applies here. The trial court entered judgment for Intra for $1,376.02, and for Ambort, on its counterclaim, for $104.00 and Ambort has appealed.

As background for the relationship of the parties, appellant had purchased drugs and related products from appellee for a number of years prior to 1962. In late 1961 or early 1962, a breakdown occurred in the structure of an aqueous hormone product produced by appellee which made the product unfit for the use for

which it was intended. All of the defective product was voluntarily recalled by appellee under advice and directions of the Federal Food and Drug Administration.

Some of the defective product had been distributed to appellant, who had in turn, sold and distributed some of it to doctors and other customers in its territory, and appellant was required to recall these sales. Appellant was given credit on its account with appellee for the products returned to appellee, but appellant contended that appellee owed for additional expenses incurred by appellant in picking up the defective product from its customers.

After considerable negotiations were carried on between the parties, appellee finally credited appellant's account to the extent of the balance owed by appellant in the approximate amount of $500.00. Appellant and appellee ceased doing business with each other for a short time but later resumed their business relations but on more restricted month to month credit basis.

As background for the present litigation, in December 1963, appellant owed appellee $1,376.02 for drugs and related products purchased in October and November of 1963. In December 1963, appellant advised appellee that there was a "black precipitate" in some of the vials of "aqueous estrone," received by appellant from the appellee. Appellee advised the appellant that this difference in color was brought about by change in temperature and only affected the *appearance* of the product and not its safety or fitness for use, and appellee suggested to appellant that the vials showing this change be picked up from doctors' offices, upon complaint or request by the customer, and in the course of regular routine business calls by appellant's salesmen.

When appellant refused to pay its account and claimed an offset against the account for the alleged expenses it had incurred in locating and picking up some of the discolored products, appellee filed suit on the

account and appellant filed counterclaim for the expense it allegedly incurred.

Appellee sent one of its salesmen on a special trip to Missouri for the purpose of picking up and returning an order of several vials of the product at a cost of $104.00, and appellant picked up other vials from various doctors' offices over a period of several months. Appellant did not request its customers by phone to return any of the product that appeared bad, and on this point at page 75 of the transcript appears testimony as follows:

"Q. When did you make your last call with regard to this picking up?

A. Well, it is hard to say that.

Q. Approximately?

A. I am still making those calls.

Q. Still making calls to pick it up and it has been—

A. Two and a half years.

Q. Two and a half years?

A. Yes, because other drugs—

Q. Did you send telegram to any of the doctors, you call doctors on telephones make an effort to get in touch with doctors?

A. In search for these things no sir? I didn't. Cost of telegram is a lot more than going to see them."

At the trial of the case, appellant contended, as set out on pages 27, 30 and 33 of its brief as follows:

"I sent our Mr. Chudy to Missouri to pick up 25 bottles on a weekend and told him to spare no expense to get up and get them. He did and charged

the company $104.81. I have that check if you want to see it. I paid him the following Saturday when he brought the merchandise in. There was no other occasion for this trip other than to pick up this. I made the rest of the pick ups. I had to search 1,500 accounts to satisfy myself that there was no more of this out and in so doing I have it written down. Of the 1,500 searches, 143 calls produced results. That is where I found bad drugs. I didn't sell the doctor nothing and these are calls I am charging these people. In figuring my expenses in making such a call, the national average is $14.00 a call to call on a doctor, wait 2½ or three hours and any drug firm will confirm this in Arkansas. We don't have expenses national people do, it don't cost as much. At $8 a call, that is gasoline, insurance, oil, motel, food, parking meters, storage, long distance calls and then your office backing you up.

\* \* \*

"I had 143 calls and I estimate $8.00 a call. As near as I can figure, that includes all expense I went to in getting products back off my customer's shelves.

\* \* \*

"I am not telling the court that when I called on these doctors I called on them for the sole purpose of picking up these products and didn't talk about selling any other product or anything. I called on accounts and tried to handle this like everything was fine. If I sold an order or if I made some other adjustment not having anything to do with this, we didn't charge it against this."

Appellant relies on three points which we now discuss in order.

1

"The finding of the trial court that appellant had not met the burden of proving that trips made by appellant were made solely to pick up that defective products is without any substantial evidence to support it and is reversible error."

We have examined the record and agree with the trial court on this point.

### 2

"The court committed reversible error in finding that appellee should have judgment 'because this all had to do with Vitamin B-12.' "

Regardless of whether the account was for Vitamin B-12 appearing as Exhibit "A" on page three of the transcript or for the other item of the exhibit through page eight of the transcript, there is no evidence in the record that appellant had paid this account and did not owe it when the suit was filed. The trial court's finding under point No. 2 was not reversible error.

### 3

"The court erred in refusing to allow appellant $239.63 for its costs in replacing the defective products of appellee."

Appellant did not return, or offer to return, the products to appellee and request credit or refund.

At pages 67 and 73 of the transcript, Mr. Ambort testified as follows:

"Q.  Mr. Lusher said something about samples or vials you have not returned, have you been holding these I assume for this particular hearing today?

A.  Yes, sir, I have.

Q.  *You propose to either return them to Mr. Lusher or Food and Drug Administration?*

A.  *Yes, sir, and I have got another four hundred some odd dollars in my truck outside.*

\* \* \*

Q.  You say you carrying that stuff in your truck, is that where salesmen—

A.  Was in my truck, we are not peddlers, ship from warehouse under constant control, these are in my truck today, *I don't know what disposition I am going to make, take a hammer and bust it up or give it back.*" (Emphasis supplied)

We find that there is substantial evidence in the record to sustain the judgment of the trial court in this case. The judgment is affirmed.

Affirmed.